## Persons C. Gilbert
### *v.*
## D. W. Guptill.

1. GUARDIANS — *when liable to account.* A guardian is liable to account to his ward, although five years may have elapsed after the ward became of age before the ward commenced proceedings.

2. SAME. In such case, the statute does not authorize a judgment against the guardian.

3. SAME — *loaning money of ward.* A guardian loaning money of ward on insufficient security, is responsible for the amount with interest.

4. SAME — *Witness.* A guardian can be compelled to testify before probate court, as to estate of ward.

5. SAME — *as to liability after guardian's office has expired.* Though the guardian may be out of office, he is still liable to account, and this liability continues so long as his bond is in force.

APPEAL from the Court of Common Pleas of the city of Elgin, Kane county; Hon. RICHARD G. MONTONY, Judge.

This is an appeal from the Court of Common Pleas of the city of Elgin, in the county of Kane.

It appears the appellant, Gilbert, was appointed guardian of Daniel H. Pinneo, a minor, then about eighteen years of age, by the County Court of Kane county, on the eighteenth of April, 1851, and executed a bond with security, and took upon himself the duties of the office. Daniel was a son of John Pinneo, deceased, who had died possessed of property in Ohio, and leaving this minor, and another son, John A., his heirs-at-law.

On the thirtieth of August, 1851, Gilbert received, as guardian, moneys belonging to his ward, to the amount of three hundred and forty-four $\frac{5}{100}$ dollars, and on the third of July,

1852, he received another sum, amounting to three hundred and seventy-five $\frac{75}{100}$ dollars.

In the summer of 1853, Gilbert sent his ward to Ohio, to receive some money there, coming to him and his brother John. It was understood, the ward received on this visit, four hundred dollars, two hundred of which he sent to appellant, which he received on the fifth of July of that year. Gilbert kept no separate account of these moneys, made no report of them to the probate court, until May, 1862, but mingled the money with his own, used it as his own by loaning it as his and taking the securities in his own name. The ward reached his majority on the second of January, 1854. On the 30th of December previous, he wrote from Wheeling, Virginia, to appellant, that he would be home in about three weeks, and to have his money ready for him.

This is the last intelligence that has been had of the young man. Seven years and more having elapsed, the county court of Kane county, on the thirtieth day of April, 1862, yielding to the presumption of his death, granted letters of administration on his estate to appellee, D. W. Guptill.

After his appointment, appellee requested appellant to account before the county court for these moneys and interest, and in pursuance thereof, appellant, on the ninth of June, 1862, appeared before that court, and presented a report bearing date May 27, 1862, which is in the form of an account current between him, as guardian, and his ward.

In this account, the guardian charges himself with these moneys above specified, and interest, " on amount in guardian's hands," to the amount of seventy-six $\frac{50}{100}$ dollars, to January 2d, 1854, when his ward became of age.

He claims as credits, moneys paid previous to January 2d, 1854, " on account of guardianship," August 30, 1851, amount paid to J. A. Pinneo on account of services for collecting the first item of debtor account ($344.05) from estate, the sum of twenty-one dollars eighty-five cents, July 3, 1852, and for collecting second item ($375.75) twenty-seven $\frac{04}{100}$ dollars. May 2, 1851, amount paid, cost of guardianship, four dollars fifty

8 — 34TH ILL.

cents; December 12, 1853, amount paid J. A. Pinneo, part of his portion of the estate "received from Daniel as above, and by Daniel's order," one hundred dollars; January 2d, 1854, amount on hand "and subject to the call of Daniel on Jan. 2, 1854, without deducting charges for services," eight hundred and forty-three dollars and sixty-six cents.

To balance this account, appellant presented these credits: "Oct. 12, 1855, amount paid J. A. Pinneo, balance of amount, his due from estate, collected by Daniel, $100, expenses $45.07, one hundred and forty-five dollars and seven cents; Jan. 6, 1855, amount loaned to E. Tefft and J. I. Clark & Co., six hundred and ninety-eight dollars and fifty-nine cents. To this amount are appended these: "The above amount of $698.59, included in a judgment in the Kane Circuit Court, Jan. 27, 1858, in the case of Persons C. Gilbert *v.* Erastus Tefft, Jason S. Clark and Demarias Clark, not collectable at present, $698.59, costs paid in obtaining said judgment, clerk's and sheriff's fees, $12.80, attorney's fees, $25, in all $37.50.

For my services, and as guardian, &c."

This account was sworn to as containing "a just and true account of the moneys which he had received and expended for the said Daniel H. Pinneo, for whom he was appointed guardian, and also all claims which he had against said minor."

This report was not approved by the court, and appellant was directed to make another report to the next July Term.

At that Term, July 19, 1862, appellant submitted another report, at great length, claiming, as in the first report, the moneys paid to John A. Pinneo; and he states that after keeping the moneys on hand, as above, for about a year, he afterwards loaned the same, together with other money belonging to himself, to E. Tefft and J. S. Clark & Co., at that time responsible men, residing in Kane county. That since the loaning of the money, as above, the said E. Tefft and J. S. Clark & Co. have become insolvent, and the undersigned has been hitherto wholly unable to collect the amount thus loaned, but he procured a judgment for the same in the Kane county

Circuit Court, June 27, 1858, but which judgment is yet unpaid. That he has paid, to procure said judgment, clerk's and sheriff's fees $12.80, attorneys' fees $25.

This report closes as follows: " And the undersigned, while submitting the above report in obedience to the order of this court, would protest against the right or authority of this court to compel this report to be made, or to enforce the payment of any sums received by the undersigned as guardian, as aforesaid, of the said Daniel, or to his representatives, for the reasons: 1st. The undersigned is not now, nor has been for years, guardian of the said Daniel; and, 2d. More than six years have elapsed since the said Daniel became of age; and for this reason, the said Daniel or his representatives, are barred from claiming an account, or enforcing the same."

To this report was appended an affidavit of appellant, " that the foregoing account he had that day rendered, contained a just and true account of the moneys which he had received and expended for Daniel H. Pinneo, for whom he was appointed guardian, and also all claims which he had against said minor."

This report was also disapproved by the court, and an account stated by the court, by which a balance was found due from appellant of eleven hundred and thirty-two dollars and twelve cents, which he was ordered to pay over to the administrator, the appellee, within ninety days from the date of the order.

An appeal was taken from this order, by the guardian, to the Circuit Court of Kane county, whence, by change of venue, the cause was taken to the Court of Common Pleas of the city of Elgin; in which court, at the January term, 1864, it was found and determined that the amount due from the appellant was fourteen hundred and forty-three dollars and seventy-six cents, and an account formally stated.

This amount is made up by charging the guardian interest on the moneys received by him, at ten per cent, and charging him with the sum received 30th August, 1851, three hundred and forty-four $\frac{05}{100}$ dollars, July 3, 1852; three hundred and

seventy-five $\frac{75}{100}$ dollars, and with one hundred dollars received sometime between September and December, 1853.

And now, here in this court, the appellant assigns as errors : 1. In compelling appellant to testify. 2. In admitting improper testimony on the part of appellee. 3. In rendering judgment or decree against the appellant for the amount rendered. 4. In rendering any judgment or decree against him.

Messrs. PLATO and SMITH, for the appellant, made the following points :

I. The appellant was not liable to render an account in this matter, for the reason that more than five years had elapsed after the ward had arrived at age before the commencement of these proceedings. Stat. ch. 66.

The proceedings in this case are *at law* or *in equity*, or in the nature of the same, and governed by the statute of limitations.

The action of account at law is barred by the statute in five years.

A bill for an account in equity barred in the same time. 2 Sto. Eq. Juris. 15, 20, and authorities in note cited ; 1 Barb. Ch. 455, 7 Johns. Ch. 91, affirmed, 8 Cow. 360 ; Hill on Tr. 850.

The statute cannot be avoided by a change of forum. *Murray* v. *Caster*, 20 Johns. 585.

II. The trust in this case is not of that class to which the statute does not apply.

The distinction between trusts to which the statute does and does not apply, is thus stated by the learned Chancellor KENT : "The trusts which *are not* within the statute are those which are the creatures of a court of equity, and *not within* the cognizance of a court at law ; and that as to those other trusts which are the ground of an action at law, the statute is, and in reason ought to be, as much a bar in the one court as the other." *Kane* v. *Bloodgood*, 7 Johns. Ch. 91.

Or, as was stated by the court in a case in Pennsylvania, in defining this distinction : "Some trusts are exclusively cognizable in courts of equity, and over others, courts of law and

equity exercise concurrent jurisdiction, and the rule is well settled that the statute applies to the latter." 23 Penn. 455. Thus approving of the distinction made in *Kane* v. *Bloodgood*, and which case is in fact the leading case upon this subject, and has been followed in very many decisions upon the question.

"When," as Chancellor KENT says, "there is a legal and an equitable remedy in respect to the same subject matter, the latter is under the control of the same statute bar as the former."

This is precisely the condition of the claim now under consideration.

The ward, on arriving at age, might have brought his "action of account" against his former guardian, and compelled the rendition of an account of his guardianship. This was a common law remedy. Reeves' Dom. Rel. 222, and authorities cited; 2 Kent's Com. 259.

Same action given by statute. Stat. ch. 2.

The ward also might file his bill in a court of chancery, and attain the same result; and by our statute compel the rendition of an account by aid of the Probate Court.

This, then, being the case, we insist, that applying the principles laid down by the Chancellor in *Kane* v. *Bloodgood*, if the party is barred from claiming an account in any forum, he is in all. "A change of forum can make no difference." 20 Johns. 586.

The case cited by the Chancellor in *Kane* v. *Bloodgood*, may be considered one of the earliest on this question, and in that case Lord MACCLESFIELD was clearly of the opinion "that when one receives the profits of an infant's estate, and six years after his coming of age he brings a bill for an account, the statute of limitations was a bar to such suit, as it would be to an action of account at common law, for this receipt of the profits of an infant's estate was not such a trust as being a creature of a court of equity, the statute could be no bar to, for he might have had his action of account against him at law, and therefore no necessity to come into a court of equity for the account.

If the infant lies by for six years after he becomes of age, as he is barred of his action of account at law, so shall he be of his remedy in this court, and there is no sort of difference in reason between the cases."

The principle above contended for was in the case of *Bertine* v. *Varian*, 1 Ed. Ch. 343, applied to a case of this very kind. In that case a bill was filed, calling upon a guardian to account. The defendant, by answer, claims the benefit of statute of limitations. The Chancellor proceeds to review all the cases on this subject, approves of the doctrine as laid down in *Kane* v. *Bloodgood*, points out the way in which the wards might have had relief on their arriving at age by an action of account at common law, and by statute (which, by the by, is precisely like ours in that particular), and coming to the decision, that as they were barred in one forum, they must be in every other.

This, then, would seem to clearly establish the right of the former guardian to interpose the defense of the statute of limitations to any claim for an account, after a delay of five years.

Again, in the 37 Penn. 122, the court in terms apply the statute to this very proceeding by citation, saying: " Though a citation to a guardian by his ward to settle his account is not a common law proceeding, yet it is governed by the same principles," and when the ward neglected to institute such proceedings for a longer period than mentioned in the statute, he was held to be barred. It seems needless to multiply authorities upon this point.

And it necessarily follows, if the position taken above is correct, that neither the Probate Court nor the Circuit Court, on appeal, could properly render any judgment for an account in this case, the statute of limitations having been relied upon by the appellant as absolving him from that liability.

The fact that these proceedings are being had by an administrator of the said Daniel H. Pinneo, can make no difference in the application of the principles cited above.

" An administrator of a ward is in the same situation, as the ward, and has no other or different rights." 14 N. H. 401.

Besides, the ward is only presumptively dead, so to speak.

There is no proof of his death, and it is only by the presumption which unheard of absence raises that he is considered dead at all.

And by this same rule of presumption he is presumed to have lived seven years from the time last heard from. *Burr* v. *Sim.* 4 Whart. 150; *Bradley* v. *Bradley,* 4 id. 173; *Smith* v. *Knowlton,* 11 N. H. 91; 1 Metc. 371. During all of which time he might have applied for and enforced an account for aught that appears.

But the force of the foregoing position in regard to effect of the statute of limitations, was sought to be avoided on the argument in the court below, by insisting that because the remedy of the ward against the guardian upon his official bond was not barred, hence an action or proceeding to compel an account was not barred. This strikes us as being strange logic. With as much propriety might it be insisted that under the statute, as it was at one time, an action of assumpsit on a note was not barred in five years, because an action of debt might be maintained on the same instrument at any time within sixteen years.

A party chooses a remedy (which in the case in hearing, is a proceeding to compel an account), and because, that a proceeding of a different nature, which might accomplish the same end is not barred, therefore it is claimed the particular proceeding commenced, though named in the statute as being barred in five years, is not barred though twice the number of years have elapsed.

It was insisted that the statute did not apply to this proceeding to enforce an account before the Probate Court. We have shown that an action of account would have been barred in five years. We have shown that a bill for an account would have been barred in the same time. We have shown that a change of forum can make no difference with the rights of parties; and finally we have shown that the courts have applied the statute to just such proceedings as this, though not named in the statute, and we confidently believe such will be the rule as adopted by this court.

III. Again it is insisted that even the statute was no bar to proceedings to enforce an account in this case, yet all that the Probate Court could have properly done, and the Circuit Court, on appeal in proceedings of this kind was to state an account, having no power to render a judgment or enforce the payment of the same.

These proceedings were had to enforce an account and for no other purpose ; for this, and this only a citation was prayed and issued. Under that process and proceeding, the rendition of an account is all that can be required. 6 Clarke, 123.

In this case (6 Clarke), an appeal was taken from the County Court to the District Court, and from thence to the Supreme Court. The error complained of was the rendering a judgment against the guardian by the courts below, and upon that question the Supreme Court says :

" Nor are we satisfied that this was in any sense such a proceeding as that either the County or District Court could render a judgment against the guardian. It was commenced by the heirs to require the guardian to make a settlement of his account with the County Court, and to ascertain the situation of the estate in his hands, belonging to the heirs. It was in no sense a proceeding to recover against him a judgment for the money received by him or in his hands. It was to compel him to state his account and report to the County Court his doings. Neither the County Court nor the District Court had any authority to render a judgment against the guardian.

" The jurisdiction of neither court was invoked for any such purpose. All that it was empowered to do was to ascertain the state of the guardian's account, in order that when so ascertained, the parties interested may take such further steps as they may deem expedient."

" Such of the heirs as were of age were entitled to demand and to receive the estate from their guardian. And on his failure to pay they had their action against him by suit on his bond to enforce payment. We do not see that there was any propriety in rendering judgment against him for the money ascertained to be in his hands."

The statutes of Iowa upon this subject are substantially the same as ours, and the case above cited would seem to be conclusive on this question.

But if it should be held that the statute of limitations did not furnish a defense against the liability of this appellant to be compelled to render an account; and if it was competent for the Probate Court or the Circuit Court, on appeal, to render a judgment for the payment of a sum of money to the appellee, still we insist that the proof shows that whatever money Gilbert ever had belonging to the said Pinneo, was by said Gilbert loaned for the benefit of the said Pinneo after Pinneo arrived at age; and in so doing Gilbert exercised due care and diligence, and notwithstanding the same was lost, yet the appellant should not be charged with the money so lost without his fault.

The rule applicable to this transaction, we understand to be this : " Persons acting in a fiduciary capacity as trustees or executors, stand in the same position as it regards their liability for property entrusted to their care, as bailees or agents generally ; and are only accountable for actual or constructive negligence or willful default."

They are not, therefore, responsible for loss, unless it has been occasioned by their own wrong, or where they are in default for not having interfered to prevent it. 2 Leading Cas. in Eq. vol. 2, pt. 2, p. 308.

In this case Gilbert, by the direction of Pinneo, got his money ready for him, kept the same ready for about one year. Pinneo did not come. Gilbert being desirous of having the money earning something for the benefit of Pinneo, loaned the same to a man supposed to be responsible, taking what he supposed to be the best of security, and that which would make him the least difficulty, and would be most for the benefit of Pinneo, and can it be said, applying the rule above laid down to this case, that Gilbert is liable to make good a loss, resulting from an act honestly done for the benefit of another.

Again, Gilbert might have labored under the impression that

it was his duty, as the agent of Pinneo, holding this money for him, to loan the same.

Some authorities go to the extent of deciding this to be the duty of an agent similarly situated.

In 32 Penn. 495, is a case in which it is said : " When an agent or trustee cannot safely pay over money in his hands, he should invest the money, and in default should pay interest."

And if it is the duty of a party under such circumstances to loan the money for the benefit of the owner, if he in so doing act with prudence, with what propriety can he be charged with loss, if any arise ?

The peculiar relations of guardian and ward ceased on the arrival of the ward at twenty-one years of age; the former guardian was no longer an officer of the court appointing him. Edw. Ch. R. 8.

All the power, authority and duty as guardian then ceases. 19 Ark. 623.

And he was no longer under the peculiar obligation imposed by the statute upon guardians, as to the care and custody of the money of his ward remaining in his hands.

His obligation and duty then became that of agents and bailees, generally, having money in their hands belonging to others; and he is subject to the rule laid down above, as quoted from 2 Leading Cas. in Eq. And we insist that the evidence shows that Gilbert acted with prudence, care, and in perfect good faith, in loaning the money to Tefft.

In Pennsylvania it has been held that a guardian, even, is not liable, who takes a bond without security, provided he acts with common skill, common prudence, common caution. *Konigmacher* v. *Kimmel*, 1 Penn. 207; 20 Pick. 116; 9 id. 461.

And we insist that even if Gilbert had been liable for a loss occurring during the continuance of the guardianship, by reason of his failure to invest in the manner pointed out by the statute, and which doctrine we deny to be the law, yet we do insist, that in the termination of the relation, by the arrival of the ward at twenty-one years of age, the obligation to make

investments, in a peculiar way, closed, and from thenceforth he was only liable for a want of common skill, common prudence, and common caution, as was said of a guardian's liability in the case above cited from 1 Penn.

V. We insist that Gilbert was not a competent witness in this proceeding.

He was a party to the record, and was the party in interest, and ought not to be compelled to testify.

VI. We insist that the court erred in fixing the amount of Gilbert's liability, even if it were proper to hold him liable at all.

His own testimony, by which the receipt of any money at all by him is proved, also clearly establishes that there was paid by him to procure the same, the various items in his report rendered, all of which should have been allowed him. Besides, he is charged by the court below, as a part of his liability, with the money, or a portion thereof, paid by Gilbert to John A. Pinneo, as his part of the money collected by Daniel, which was most clearly wrong.

Daniel collects money belonging to both himself and brother John. John's portion he sends home to Gilbert, and he pays the same to John, and Daniel keeps that belonging to himself, and it never gets into the hands of the guardian at all, and with what propriety is Gilbert charged with the same? We insist this also was wrong.

VII. The county court has no jurisdiction to compel by citation a report to be made by Gilbert, he being no longer an officer of that court. 1 Ed. Ch. Rep. 8.

We have thus briefly pointed out some of the objections which appear prominent against the judgment and decree of the court below, all of which seem to be of importance, and which must, as it seems to us, make it necessary for this court to reverse this case.

Mr. SYLVANUS WILCOX, for the appellee in reply:

The office of guardian touches the conscience and honor, and the utmost good faith and fairness in the management of

the property of the ward by the guardian, and in his accounts with his ward, is required. 1 Sto. Eq. Juris. §§ 317–20; 2 Kent, 229; *Cummins* v. *Cummins*, 15 Ill. 33; 1 Gilm. 177; 6 Clark (Iowa), 123.

The reports of Gilbert, as above stated, failed to show what he did with the ward's money, except that he mingled it with his own, and used and operated with it as his own. It sufficiently appears that he kept no regular account with his ward; that he did not keep the ward's money separate from his own; that he did not loan as guardian, and on account of the ward, separate and distinct from his own, any of the ward's money; that he omitted in every particular to comply with the directions of the statute in the management of the money of his ward; that he made no report or statement to the court of the amount of money he had received, or when he received it, until May 27, and that he never applied to the court for any order in regard to loaning his ward's money, or paying out money for the ward. In other words, it is shown clearly that he disregarded wholly his duty as guardian. And the question is how he shall be held in accounting with his ward.

Shall he be permitted to profit by his disregard of the duty imposed upon him by the statute as a guardian? Shall he, by disregard of duty, whether through ignorance or design, be charged with less than he should or would be had he faithfully and fairly performed his duty? . Certainly not. Courts are severe and exacting towards guardians or trustees, acting in a fiduciary capacity, who neglect their duty, render no regular accounts, and are indefinite, uncandid, and unfair in the statements of their guardianship, or trust accounts, while towards those who attend to their duty, act in good faith, keep regular accounts, and are candid, full and frank in the statements of their accounts, the court deals liberally and indulgently. Hill on Trustees, 568, 844; 1 Bouv. Inst. 144, § 351, p. 145, § 387; 14 Ill. 1; 15 id. 33; 1 Gilm. 177; 2 Kent, 230; Sto. Eq. ; *Jennings* v. *Kee and Wife*, 5 Ind. 257; 6 Clark (Iowa), 123.

The duties of a guardian as to managing the money of his ward, is clearly defined by statute in this State.

Speaking of guardians the statute (Stat. of Ill. p. 551), section eight, says: " It shall moreover be their duty to put to interest the moneys of their wards, upon mortgage security, to be approved by the court, which letting shall always be for one year, and at the end of each year the interest shall be added to and made a part of the principal," and (id. p. 553, sec. 15) " guardians shall have power to loan out the money of their wards at interest in sums not exceeding one hundred dollars on personal security, to be approved by the judge of probate; *Provided*, it shall not be let for a longer term than twelve months without a renewal and an approval of the security by the court, and if neglected longer, it shall be at the responsibility of the guardian."

It was Gilbert's duty to loan Pinneo's money as soon after he received the same as it could be loaned, to let it for one year, to take security — real estate, where the sum was over $100, where the sum was $100 or less, personal estate might be taken — and cause the security to be approved by the court. At the end of the year it was his duty to add the interest to the principal, and make of the total a new principal, and let it in the same manner, thereby obtaining for the ward compound interest. The statute nowhere fixes the rate of interest. The law during all the time Gilbert has had Pinneo's money allowed ten per cent. as a legal rate for money loaned.

The statute requires the guardian to loan the money of his ward. This of course means that if he can do so, he must. The law presumes that he can do so until the contrary appears. And courts will assume (and act upon the assumption in determining the account between guardian and ward) that the guardian could loan the money as required by the statute, and that too, at the highest legal rate, unless by the report of the guardian he shall show that he could not loan it, that he had endeavored to loan it but was unable to do so, and the same rule applies as to the rate of interest. The guardian must act to the best advantage for his ward — he has an active duty to perform, and within the law must exert himself to further the interest of the ward, as a prudent owner would. *Litchfield* v.

*White,* 2 Seld. N. Y. 438, and cases cited; 2 Kent, 229, 230, 231; 14 Ill. 1; 15 id. 33; 1 Gilm. 177; *Boynton* v. *Dyer,* 18 Pick. 1; 2 Wend. 77.

The reports of Gilbert are silent upon these points. They show nothing as to the demand for money at the time he received Pinneo's moneys; nothing as to whether he could or could not loan the same; nothing as to the rate of interest prevailing at the time; nothing as to what he did with the money, except that he mingled it with his own and used it as his own.

In consequence of this disingenuousness, according to established principles of law, the court should construe and presume in all matters strongly against him (5 Ind. 257; 1 Gilm. 179), and should hold that he could, immediately upon receipt of each sum of money, have loaned the same at ten per cent. per annum, payable annually, and charge Gilbert with that amount, that is, compound interest at ten per cent., as required by the statute. See also 14 Ill. 1, and cases cited; 15 id. 33; 1 Gilm. 173; 18 Pick. 1; 6 Clark (Iowa), 126.

In this case, however, these presumptions are unnecessary, in order to charge Gilbert with compound interest at ten per cent., for the testimony proves conclusively that money, during the entire years from 1851 to 1860, commanded readily from ten to twenty-five per cent. on good security, interest paid annually.

Gilbert, upon the subject of the rate of interest, and to whom he loaned money (fortunately for himself), was able not to recollect anything, except when confronted by a person (accidentally discovered by Guptill) to whom he had loaned money, as in the instance of Peasly.

The proofs in the case established the fact that Gilbert could, immediately upon the receipt of each sum of money belonging to his ward, have loaned the same readily at ten per cent. interest, payable annually, on the best of security, and could have done the same every year from thence up to 1860, and even later, and that he knew this. And it further shows, that he used the money as his own, and asked and received a higher rate of interest for the money as his own.

Had Gilbert then faithfully and honestly discharged his duty as guardian in the management of Pinneo's money, he could and would have realized for his ward ten per cent. annually therefor even up to this period, and Pinneo's representatives would now have the original amounts of money received by Gilbert, and compound interest thereon at ten per cent. added.

Now the question is, shall he, by neglecting his duty, be charged with less than he would be had he performed his duty?

Shall he be permitted to gain by a breach of faith and violation of duty?

Surely not, unless it is proposed to encourage by rewards, dishonesty and disregard of important legal duties.

The court of the city of Elgin, in making up the account, charged Gilbert with interest at ten per cent. annually, up to January 2d, 1854, and after deducting commission at six per cent. to Gilbert, charged him six per cent. on the balance, from thence to the time of entering the order of the amount due from him.

According to law and the evidence in the case, the court certainly could do no less than charge Gilbert ten per cent. annually until January 2d, 1854, when Pinneo became or would have become of age, and it is submitted that the court should have charged Gilbert the same rate of interest instead of six per cent. after that time, because as to the money in his hands belonging to his ward, Gilbert, after the ward attains to majority, remains and is to be treated as guardian until he makes a final settlement of his guardianship account. The law requires him to make a final settlement of his accounts before the court. He can, after his ward has arrived at age, make this settlement of his own volition, whether asked or not by the ward, or consented to or not by the ward, or whether the ward after notice is present or not, and it is his duty to do it. And until he does make this settlement, the relation continues, and while the relation continues, the duty in regard to management of the money must necessarily also continue.

Statutes Ill. p. 551, § 6, 7, and p. 553, § 16, and p. 554, § 1; *Coon* v. *Coon*, 6 Ind. 268; The Law of Trusts and Trustees, by Tiffany & Bullard, pp. 134, 861–5; Hill on Trustees, (580 side) top 844–5–6; 3 Johns. Ch. 216–7; 18 Pick. 1.

It is therefore believed that this court will increase the finding of the court below, by charging Gilbert 10 per cent. instead of 6 per cent. interest from the 2d of January, 1854, up to the moment the court may determine this appeal, and compound the interest; and it is also believed that this court will not allow Gilbert any commission — that allowance of $57.51, as of January 2d, 1854, ought to be stricken out. His conduct deserves punishment and not pay. 6 Clark, 123. And yet to strike this item out and charge him with compound interest at 10 per cent. during all the time he has had the money will not punish him, because he made much more than that by the use of the money, considering the high rate of interest prevailing, and which he charged.

Gilbert objects to being responsible for the $100 which the court charges him with, as of date January 2d, 1854. This is a proper charge, and instead of its being $100, it ought to be $200. The second report of Gilbert, as well as his evidence, shows that he made his ward his agent, sent him in 1853 to Ohio, there to receive $200 belonging to the ward, and $200 belonging to John A. Pinneo; that the ward got the money, and in the fall of 1853 remitted $200 to Gilbert. Gilbert claims that he, at the time, supposed one-half of this money was for John A. Pinneo, and accordingly gave him (John) $100 of it. Afterwards, in 1855, he claims that he learned from John that the other $100 was meant for John, and accordingly he alleges in October, 1855, he handed John the other $100. All the evidence of the truth of this story about this $200 being for John, is what Gilbert says John said, and papers purporting to be receipts from John. And the only evidence that John ever received any of this $200, is Gilbert's statements and these papers. The statements of Gilbert cannot be relied upon, as is apparent from the contradictions and suppressions of facts in his reports and evidence — his conscience is

too supple to be trusted. The receipts being so easily manufactured, and having the sanction of no oath for their genuineness, are entitled to little or no weight as evidence.

Again, there was certainly $200 belonging to the ward. As guardian, it was Gilbert's duty to obtain and take care of this $200 for his ward. He was appointed for the express purpose of taking possession of and safely keeping Daniel Harvey Pinneo's money. Pinneo was incapable of managing his own money while a minor; it would be got away from him and dissipated if he were allowed to have it. To prevent this, Gilbert was appointed guardian, and allowed pay for the service he should render in preserving the money for Pinneo until he became of age. And Gilbert should be held responsible for money belonging to his ward, which he permits the ward to take and waste, the same as though he had allowed a stranger to squander it. If Gilbert is not charged with this $200, there is little use in appointing a guardian for a minor.

The court being satisfied that $100 was meant for the ward, and that Gilbert received it as his guardian, and that the pretense of paying the same to John in October, 1855, about two years after Gilbert had received it, was an afterthought, did right certainly in charging him with the same; and for the reasons above stated, it is submitted that Gilbert should be charged with the other $100.

The court properly rejected the three items claimed by Gilbert to have been paid out and expended for and on account of the ward. Gilbert's conduct as guardian being disingenuous, precludes him from asking indulgence of the court, and requires proof of the necessity, propriety and reasonableness of every charge he may make against his ward, and he must also show that he actually paid the money. There was no proof offered by Gilbert on any of these points as to either of these items. *Cummins* v. *Cummins*, 15 Ill. 38; *Davis, adm'r,* v. *Harkness et al.* 1 Gilm. 177; 14 Ill. 1; 2 Kent, 230.

The objections raised by Gilbert in the court below will now be noticed, for the reason that, I suppose (though I do not

9 — 34TH ILL.

know, as I have not yet seen their brief or abstract), they will be urged here. These objections are:

1st. That the County Court has no authority to adjudicate upon Gilbert's guardianship accounts, because the ward had arrived at majority, and could settle for himself.

2d. That Gilbert should not have been asked to testify orally before the court.

3d. That Gilbert ceased to hold Pinneo's money as guardian after Pinneo became of age, but held it after that time as agent, and as such agent he lent Pinneo's money, and it was lost; and in the matter he acted as a prudent owner would in the same circumstances, and therefore he is not liable.

4th. That five years having elapsed, the claim was barred by the statute of limitations.

1st objection. If the county court has jurisdiction over guardians in the matter of their accounts only while the ward is a minor, then there is a lamentable defect in the law. The ward, if this be true, must, after he arrives at majority, either settle with the guardian on the guardian's own terms, or resort to the long, tedious, and expensive proceedings of a bill in chancery. The object of conferring jurisdiction upon the county court in matters of guardianship, which was to furnish a cheap and expeditious tribunal for the purpose, would be substantially defeated. The court, in construing the act, will consider the object, design, and purpose in general of creating the law, and will interpret the language used, if possible, without violating the plain meaning of the words, so as to carry into effect such object and purpose.

The statute, considered in reference to this rule of construction, clearly grants power to the county court to compel a guardian to settle his guardianship accounts with and before the court, after the ward attains his majority.

The language used in the statute necessarily implies that guardians shall account to the court after the ward has ceased to be a minor.

On page 553, § 16, Statute of Illinois, the language is, *guardians on final settlement,* shall be allowed such fees, &c.,

as shall seem reasonable, &c., to the *Judge of Probate.* Again, on p. 554, § 1, the language is, "*that each and every Guardian, &c., are hereby required on final settlement, before the Probate Justice of the Peace or other tribunal before whom guardians may be bound to settle by law, to exhibit their account* against their ward, under oath", &c.

Now, there cannot be a final settlement until after the ward has arrived at that age which by law confers upon him the right to demand and receive into his possession and control his property, which the guardian has or has had, that is, after the ward attains his majority. Then it is that the guardian shall make a final settlement before the County Court, and exhibit his accounts under oath to the court.

The law generally seems to contemplate that *time,* after a ward comes to his majority, shall be allowed him to examine and investigate the accounts and management of the guardian, (7 Paige, 46 ; 1 Gilm. 173, (180); 3 Johns. ; 18 Pick.), and will scarcely, under any circumstances, allow a gift or sale by the ward to the guardian to stand, if made directly upon the ward's arriving at age. 1 Sto. Eq. §§ 317-320 ; 2 Kent, 229, note.

There can be no good reason why the County Court should not have the power to compel guardians to settle after the ward has arrived at full age; on the other hand, the public interest and convenience require that it should possess this power, and a fair construction of the statute confers it upon the County Court. There is no force, then, in Gilbert's first objection.

2d objection. It is the common practice in the County Courts, to compel guardians, executors, administrators, &c., when requested, to submit to an oral examination. An honest guardian never would object to it, he could not be harmed by it. A dishonest guardian, if he desired, by suppressing truth to reap advantage, would of course complain. As an abstract question, it is believed to be a practice warranted by the law. Courts of chancery compel guardians, if desired by the ward, to submit to an examination under oath by means of interrogatories which may be propounded, until the conscience of the guardian has been racked upon every point connected with his

guardianship affairs. In analogy to this practice, County Courts having jurisdiction of the subject matter, possess like power to sift the conscience of the guardian, and as written pleadings, such as prevail in the court of chancery, are dispensed with in this court, oral examinations necessarily supersede the interrogatory system, and on appeal to the circuit court, the same practice should obtain.

But suppose there was error in this particular, no damage was done to Gilbert, and hence this court would not reverse the decision on that account.

3d Objection. If the position heretofore taken, to wit: that the relation of guardian and ward continues after the ward has attained to majority, so far as settling his accounts and delivering property to the ward is concerned, then there is no force in this objection. The authorities cited and sections of the statute referred to, sustain, I think, this position.

But suppose, for the sake of the argument, that immediately upon Pinneo's arriving at the age of 21 years (January 2, 1854), Gilbert ceased to hold the money as guardian; he still had the money; it belonged to Pinneo; he must hold it then as trustee or agent. He could not hold it, as agent, without appointment as such, express or implied, by Pinneo. There is no evidence of such appointment; on the contrary, the testimony of Gilbert, and letter of Pinneo to Gilbert, proves that the only direction Gilbert ever received from Pinneo (which too was given before he was of age), as to the money, was, that he should come for it in a short time, and wanted it then. He then could not hold the money as agent. But suppose he had held it as agent, he would be, nevertheless, liable for the money and interest, even if the part, or the whole, was Pinneo's money (which it was not) that was loaned to Tefft and lost, because Gilbert did not loan it as agent of Pinneo, but loaned it as his own and in his own name; he is the payee in the note, and not Pinneo. Again, he loaned it at an usurious and unlawful interest; doing which without instruction, would make him responsible for the money, particularly when, as in this case (as is shown by Gilbert's letter of 10th of Feb-

ruary, 1858, to John A. Pinneo, page of Record 42, and by Black's evidence, page of Record 38, 51, and E. Tefft, page 74, 75, 77), it clearly appears that had it not been for the usury, the debt would not have been lost. Again, the second report of Gilbert, as well as his own evidence, shows that he mingled Pinneo's money with his own as soon as he received it, and it never afterwards was separated; and in such case any loss sustained must fall on himself. (*Marine Bank* v. *Rushmore*, 28 Ill., 471 ; 2 Kent, 230.

If Gilbert held the money as trustee, the same rules of law apply. He must keep the money distinct and separate, and if he loan it, which he would be obliged to, he must loan it as a distinct transaction in his official capacity, and for and on account of his *cestui que trust*. He can only loan it at legal rates. If he mingles it with his own money, or operates with it as his own, he takes the risks of loss upon himself. He is not permitted to occupy an equivocal position, such as to say, Gilbert's if there is gain, Pinneo's if there is loss. 28 Ill. 471 ; 2 Kent, 229, 230. Gilbert tried to occupy this position.

The proofs show that the money which he loaned at 14 per cent. interest, to his brother-in-law E. Tefft in January, 1855, was in no sense Pinneo's money ; the most that can be said is, that it was Gilbert's money, with which, when Pinneo came, he designed to pay Pinneo, in whole or part. It certainly was not the original, identical money received by Gilbert as guardian of Pinneo, nor the proceeds thereof, because Gilbert never kept that money separate from his own, but put it with his and loaned and used it as his own, and the identity of the money was lost for from one to three years before the loan to Tefft was made. And as Pinneo never settled with Gilbert, or promised directly or indirectly to receive or treat as his, any particular money in Gilbert's hands, and as Gilbert could not by simply calling certain of his own funds Pinneo's money, make it so, therefore the loan to Tefft must be taken and considered to be precisely as it imported on the face of the note to be, Gilbert's loan and money and Gilbert's loss.

The proofs (E. Tefft's deposition, Black's evidence, and Gil-

bert's admission,) show, that when the note of Tefft, Clark & Co. to Gilbert became due, to wit, January, 1856, it was collectable, good, and when sued in 1857, was good, and if it had not been for the usury which delayed the recovery of judgment from May, 1857, to February, 1858, the note would have been collected. Again, if Gilbert had taken a judgment note, the loss would not have occurred. The loss then is the result of Gilbert's illegal act and imprudent and negligent management, and he should therefore sustain it himself.

4th Objection. The plea of the statute of limitations, if applicable, came too late. By all rules of law it must be pleaded in the first instance. It was not so done in this case. The first report does not set up the statute as a bar — on the contrary, it acknowledges the debt as subsisting. It admits that the relation of guardian and ward, so far as accounting is concerned, is still subsisting between Gilbert and Pinneo, and the statute of limitations is no bar to an action by the *cestui que trust* against the trustee, while the relation of trustee and *cestui que trust* is admitted to exist; it does not begin to run in equity until the relation is denied, and the alleged trustee holds adversely to his *cestui que trust.*

*Decouche* v. *Savetrea*, 3 Johns. Ch. 216–7; 7 id., 80, 113; Law of Trusts and Trustees, by Tiffany & Bullard, 715 to 719.

But there is no statute of limitations barring the right of the ward or his representative to require the guardian to make a final report, and settle his guardianship account.

It is a settled rule that the statute of limitations will not be applied to cases not *clearly* within its provisions. *Hazell* v. *Shelley*, 11 Ill. 9; 4 Gilm. 194.

The statute before cited, makes it the *duty* of the guardian to make a report and final settlement. The statute of limitations makes no provision barring the right of the ward at any time to call upon the guardian to perform this duty, nor does it permit the guardian to plead his own neglect of performance of a positive duty required of him, no matter how long his neglect may have continued, as a bar to an effort of the court

or any person interested to compel him to discharge that duty.

Again, if the rules of analogy are applied, then the statute of limitations cannot bar this case, because by law, Pinneo or his representatives can any time within 16 years from the date of Gilbert's guardian bond, to wit: April, 1851, sue him and his sureties upon that bond, and recover the amount due Pinneo, as found by the county court, or as the fact may be. See Statute, p. 752. So that in no event can the question of the statute of limitations interfere with the right of Pinneo's representatives to recover of Gilbert in this case.

It is believed that there is no force in any of the objections raised by Gilbert, and that the court will increase the amount which Gilbert ought to pay, by charging him with the other $100, and deducting the allowance made him as commissions by the court below, and by charging Gilbert interest at ten per cent. instead of six, after the ward came of age.

Objection was taken by Gilbert as to the form of the order, which required him to pay over the money within a specified time. It is believed that the form is as it should be, but as the form is not material, the court can correct it and make it as it should be, without reversing the case on that ground.

Mr. Justice BREESE delivered the opinion of the Court:

The appellant, on his assignment of error, makes these points: 1. That appellant was not liable to render an account in this matter, for the reason that more than five years had elapsed after his ward arrived at age, before the commencement of these proceedings. 2. If the statute was no bar to the proceedings, yet all the court could have done was to state an account, having no power to render a judgment or enforce the payment of the same. 3. That if this power existed, the appellant having loaned the money for the benefit of his ward, he cannot be charged with the loss of the money, he having exercised due care and diligence. 4. That appellant was not a competent witness in this proceeding. 5. If any liability was established against appellant, the court fixed too large a sum.

6. The County Court had no jurisdiction to compel, by citation, a report to be made by appellant, he being no longer an officer of that court.

Upon the first point, appellant cites several cases supposed to be decisive of this.

It is admitted, if the statute of limitations would be a bar in a court of law, it would also be a bar under the same circumstances in a court of equity. The statute cannot be avoided by a change of forum. And it is also admitted, that where the jurisdiction is concurrent, the statute also applies to the court of equity.

These are general principles which no one will dispute. The case of *Bertine* v. *Varian*, 2 Edw. Ch. 343, is also referred to as a case in point. That case certainly decides that a guardian of an infant can interpose the statute of limitations to a bill filed against him, or his administrator, for an account. It decides that the remedy was complete at law when the wards arrived at full age, and no sufficient reason was shown why they did not resort to the remedy in apt time.

In that case, from the time one of the wards came of age to the death of one of the guardians, eleven years had elapsed, and in the case of the other complainant, about eight years, during all which time no steps were taken to call the guardian to an account; and after his death, about nine years more supposed to elapse before that suit was instituted against his representatives, and no reason given for the delay. That the presumption arises from this lapse of time, that the claim had been satisfied and the vouchers lost. The Vice-Chancellor, however, says, if the delay could have been satisfactorily accounted for by the production of sufficient facts, such facts would prevent the operation of the statute in the view of a court of equity.

The appellant's counsel also refers to 37 Penn. 123, without complying with the rule of this court, by giving the names of the parties in the case. We have examinel that book at the page indicated, and find no case there bearing on this point, certainly none which appellant's counsel have given in their brief as a quotation from it.

He also cites 14 N. H. 401, without giving the names of the parties. We find at that page the case of *Kittredge, adm'r,* v. *Betton, ex'rx,* but do not find the principle there asserted in the terms in which it appears in the appellant's brief. That case merely decides that a settlement out of court between a guardian and his former ward, who has come of age, and a release to the guardian, is not a compliance with the condition of his bond, which requires the guardian to render an account, when required, in the Probate Court, and that the administrator of a ward, when in the Court of Probate, has the same privilege as the guardian, who, on being cited to the Probate Court, relies on such a settlement, he must bring into court the settled account, that the ward may there surcharge and falsify it.

Notwithstanding the case of *Kane* v. *Bloodgood,* 7 Johns. Ch. 91, and the other cases cited, as based upon it, Hill, in his elaborate work on trustees, after an examination of all the cases decided in England, and which are cited and commented on in *Kane* v. *Bloodgood,* says: " On the whole it must be admitted that the effect of the statute of limitations, as applied to the estates of trustees, is left in a very unsatisfactory state by the authorities, and it is extremely difficult to gather from them any very definite rules of general application on the point." Hill Trust. 268.

The answer to the authorities and argument of appellant is this, that the citation to account before the Probate Court is not in the nature of the action of account at law or in equity, and which would be barred in five years. It is merely a mode provided to ascertain the sum for which a guardian is chargeable in the Probate Court, and is the proper mode in most cases, to lay a foundation for proceedings against the sureties in the guardian's bond, and in which no judgment is rendered. This appears, from the case cited by appellant, from 14 N. H. 401. And what is the statute upon the subject? The sixth section provides that courts of probate shall have power, with or without previous complaint, by an order duly made and served, to oblige all guardians of minors, from time to time, to render their respective accounts upon oath,

touching their guardianship, to said courts for adjustment, and shall have power to compel them to give supplemental security, &c., and to remove them.

What is the condition of the bond a guardian is required to give? It is that he will faithfully discharge the office and trust of guardian according to law; that he will render a fair and just account of his guardianship to the court appointing him, from time to time, as he shall be required by the court, and comply with all the orders of the court, lawfully made, relating to the goods, chattels and moneys of the minor, and render and pay to the minor all moneys, goods and chattels, title-papers and effects which may come to his hands as guardian. This bond is not to be void on the first recovery, but may be put in suit from time to time against one or all the obligors.

This bond is a continuing surety until the penalty is exhausted, and the settlement with the Court of Probate, by the guardian, made before or after the ward arrives at full age, fixes the amount of damages to be recovered under the bond. This bond, by section one of the limitation act of 1849 (Scates' Comp. 752), remains in force for the term of sixteen years as such security, and can be sued on from time to time, within that period. Therefore, we say, as the accounting before the Probate Court, is not a suit within the meaning of the statute, but is a means of ascertaining a delinquency, so that suit may be brought for the amount of the delinquency, so adjudged by the Probate Court, against the obligors in the bond, the statute of limitations was no bar to the proceedings before the Probate Court, and cannot be pleaded in bar so long as the bond has force and vitality. It will not be denied that the administrators of one who has been under guardianship, can bring all actions, resting in contract, which the ward himself might have brought, provided such actions are brought within the time limited by law. This being so, it cannot be denied, such administrator has the right to the securities, given by the guardian for the protection of his ward; and having this right, it must follow that he has the right to use the means the law

gives, to ascertain for what amount, on accounting before the Probate Court, the guardian and his sureties are responsible under the bond, and to this inquiry there is no limit but sixteen years.

The case cited from Edwards' Chancery Reports is the only case we have been able to find where the point was directly determined that a guardian, or rather his personal representatives, could interpose the statute of limitations. And in that case it seems to be placed rather on the ground of staleness of demand from lapse of time.

The facts in this case are different greatly from the facts in that, and are peculiar. The ward's unaccountable disappearance, about the very day he became of age, the delay necessarily occurring, so that the legal presumption of his death should obtain, by receiving no intelligence of him for seven years. As he was of age on the 2d of January, 1854, and the last information of his being in life was on the 30th of December preceding, it is not impossible that he died before he came of age. These facts will account for any delay that has occurred, if any delay can be charged in the case.

But there is something more in the case. If the statute of limitations was a good plea, did not the appellee show enough by the admissions of appellant in the several accounts he rendered to the court, especially the first one, to take the case out of the operation of the statute in a court of equity? We think he did. At the first investigation of his accounts, he did not set up this defense, but submitted to an accounting, and probably never would have set up the statute, could he have received a credit for the judgment against Tefft and Clark. But be this as it may, his rendering an account shows that he still occupied the position of a trustee towards his beneficiary, and while that relation subsisted, the statute could not be interposed. Had he denied this relation, then it might be said his attitude was hostile and adverse to his *cestui que trust*. It is true, in his protest, he declared he had not been guardian for some years, which was not the fact, as his duties as guardian had not ceased until he had fully accounted and paid over the balance against him.

Upon the next point we have to remark, that it does not appear the court below entered up any judgment against the appellant, but found a certain sum due, and directed him to pay it over to the administrator. This finding fixes the amount of the recovery under the bond, it is *res judicata* as to the amount.

The third point made by appellant has no evidence to rest upon. All the testimony shows a flagrant disregard of the interests of his ward in loaning this money. The eighth section of the statute respecting guardians and wards provides, that guardians shall put to interest the moneys of their wards upon mortgage security to be approved by the court, the letting to be for one year, and at the end of each year to add the interest to and make it a part of the principal. This he did not do, but suffered nearly all the money to remain from year to year in the hands of his brother-in-law, without any security and without the approval of the court, and on which the interest was not compounded annually, nor any gains made thereon for his ward. This was a great dereliction of duty, and the loss of the money is clearly chargeable to his own negligence and disregard of the statute.

Upon the point that appellant should not have been compelled to testify, we answer, that he testified voluntarily. As the proceedings before the Probate Court are likened to proceedings in chancery (*Moore v. Rogers*, 19 Ill. 347; *Dixon v. Buell*, 21 id. 203), this may be likened to a bill for a discovery against the guardian, wherein it is necessary to sift his conscience, and to get at facts of which he alone could have any knowledge, as he had never reported any of his actings and doings, as guardian, to the court. But it is too late for him now to make the objection. He testified voluntarily, and his evidence is recorded, and by that he must be judged. Though he was a party interested, that was waived by the appellee, when he consented that his evidence should be heard.

Upon the last point made by appellant, it is sufficient to say, if appellant was not an officer of the court, at the time he made his report, it can make no difference; he was before the

court voluntarily, to render his account, on oath, of his guardianship, which he had covenanted to do by his bond. He rendered his account, and made oath that it was just and true, and the court had a right to interrogate him as to its correctness, and upon his guardianship generally. He voluntarily submitted to the jurisdiction, and it is now too late to raise any question about it.

·Another point remains to be considered, and it is as to the amount of the recovery. It will be seen by the letter of the ward, of December 30, 1853, to appellant, written from Wheeling, he informed appellant he should return home in a few weeks, and desired appellant to have his money ready for him, as he would then be of age. This request, it was the duty of appellant to be ready to meet, as his ward would then have the right to demand his money. After that event, appellant would have had no right to loan the money, or use it in any manner, but be bound to have it on hand to pay over on demand; consequently, appellant should not be charged with interest after the day his ward arrived at full age, unless it can be shown he made profits out of the money. The appellant should be charged with the moneys he received belonging to his ward, and compound interest thereon, at six per cent. from the day he recived it, until his ward became of age, and interest on the amount, from the day of demand by the administrator of the ward, to the time of entering the final order. The recovery below exceeds the amount these data would establish.

The order of the court below is reversed, and the cause remanded to the Circuit Court, with directions to state an account as follows : Charge appellant with the moneys he received, and calculate interest on the amount, at six per cent. compounded annually, to the day the ward became of age, and credit him with the expenses paid by him, amounting to sixty-two $\frac{46}{100}$ dollars, and his commissions at six per cent. on the whole amount received, and then charge him with interest at six per cent. on the balance, to be calculated from the day (ninth of June, 1862,) appellee demanded an account, to the day of entering the final order. No account will be taken of

the money collected by Daniel in Ohio, one-half of which, being two hundred dollars, he transmitted to appellant for his brother John, to whom it belonged, the other half Daniel retained, as it appears from all the circumstances, to his own use, which he had a right to do.

*Judgment reversed.*