Roberts v. Draper.

CLARK ROBERTS ET AL., Adm'rs, etc.,

v.

DANIEL K. DRAPER.

1. GIFT INTER VIVOS.—To constitute a gift *inter vivos* there must be a gift absolute and irrevocable, without any reference to its taking effect at some future period. The donor must deliver the property and part with all present and future dominion over it.

2. GIFT—CAUSA MORTIS.—A gift *causa mortis* is defined to be a gift of personal property, made by a party in expectation of death then imminent, and upon an essential condition that the property shall belong fully to the donee in case the donor dies as anticipated, leaving the donee surviving him and the gift is not, in the meantime, revoked, but not otherwise.

3. CONDITIONAL DEPOSIT OF MONEY.—Where one about to take a journey hands a sum of money to another with the request that in case he never returns from his journey, his friend shall give the money to a designated charitable institution, and he subsequently returns safely from his journey, but dies without making any further valid disposition of such sum of money, such facts will constitute neither such a gift *inter vivos* nor *causa mortis* as to entitle such charitable institution to the said sum of money.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding. Opinion filed January 6, 1886.

Messrs. MILLARD & SMITH, for appellants; as to gift *mortis causa*, cited Raymond v. Sellick, 10 Conn. 480; Grattan v. Appleton, 3 Story, U. S., 755; Redfield on Wills, Part 2, p. 296; 1 Roper on Legacies, 26, 40; Ward v. Turner, 2 Ves. Sen. 431; Bloomer v. Bloomer, 2 Bradf. Sur. Rep. 339; 1 Story's Equity, 606; 1 Williams on Executors, 774.

As to gift *inter vivos:* Jackson v. 23d St. Ry. Co., 88 N. Y. 520; Northrup v. Hale, 73 Me. 66; Robinson v. Ring, 72 Me. 140; People v. Johnson, 14 Ill. 342; Cranz v. Kroger, 22 Ill. 81; Pearson v. Pearson, 7 Johns. 26; Cotteen v. Missing, 1 Maddock Ch. 103; Carpenter v. Davis, 71 Ill. 395; Wilson v. Keller, 9 Bradwell, 347.

BAILEY, P. J. In this case a citation issued from the Pro-

bate Court of Cook county, at the instance of the administra-
tors of the estate of Timothy Hubbard, deceased, against Daniel
K. Draper, requiring him to show cause why he should not
pay over to said administrators the sum of $650, of moneys in
his hands, alleged to be a part of said estate. Draper appeared,
and upon a hearing before the probate court, an order was
entered requiring him to pay $600 of said money to said ad-
ministrators. From this order Draper appealed to the circuit
court, where a trial was had before the court and a jury, re-
sulting in a verdict in favor of Draper. A motion by the ad-
ministrators for a new trial having been overruled, judgment
was entered on the verdict, and the administrators have
brought the record to this court by appeal.

Draper was the only witness who testified at the trial, and
according to his testimony the money in controversy was
placed in his hands by Timothy Hubbard, in August, 1883,
under the following circumstances:

Hubbard was Draper's stepfather, and was then living in
Draper's house, in the town of Wheeling, Cook county, Illi-
nois, and was about to go on a visit to Amherst, Massachusetts,
his native town. On the evening before his departure, he
went into the room where Draper was, when Draper remarked
to him, "Father, you are about to leave us for awhile," to
which Hubbard replied in the affirmative, and said he
presumed it would be the last visit he would make to the
East; that he was not going for the pleasure of the visit, but
felt there was a duty which called him there; and he then
placed in Draper's hands $650, and said that if anything hap-
pened to him while he was gone, or he should not return, he
wanted Draper to give $600 of that money to the Foundlings'
Home, and $50 to a Mr. Hazelton, who was trying to get a
depot for the Chicago, Milwaukee & St. Paul Railway Com-
pany built by subscription near Draper's farm, said $50 to be
paid over when the depot should be built. Draper then said:
"Father, if anything should happen to you and you should not
return, I might be called to account for this transaction by
your legal heirs;" to which Hubbard replied, "Well, I think I
have a right to make a gift if I choose."

Roberts v. Draper.

Hubbard went on his journey East, and returned on the 5th day of October, following.  A few days after his return he was taken ill, and Draper having entered  the room  where he way lying on a lounge apparently much prostrated, said to him : "Father, are you sick?"   "Are you feeling worse to-day?" to which Hubbard replied, "I feel pretty shiftless," and commenced conversing about the disposition he wished to have made of his property, saying, " I have been thinking the matter over in my mind of what I want to do with some of my property;" and he then proceeded to state how he wished to remember Draper's two sisters and Draper's wife, and each of his own legal heirs, including all his nephews and nieces, and the heir of a deceased nephew.   Draper then said:   "Father what do you propose to  do with the balance of your property?   The sums you have named to me won't take nearly all of that. · Do you intend giving it to some charitable institution or something of that kind?" Hubbard replied, "Perhaps ; I have not exactly made up my mind."   Then Draper said, "This sum that you have deposited with me for the Foundlings' Home, why have you done that and selected that institution and are undecided with regard to some of the others?" and he replied, "I know the officers of that institution, or some of them, and have confidence in their management." Draper, understanding that Hubbard was talking about a final settlement of his affairs, in contemplation of death, said to him, "Father, you need, if you wish to do this—if you wish to make this distribution of your property—you know you will have to make a will;" and Hubbard replied, "Yes, I suppose so.   I think I will see Mr. Dutton (a justice of the peace of the neighborhood), and will talk the matter up with him when I have a chance." A few days afterward Hubbard died without having made a will, and without saying anything further in relation to the disposition of his estate or of the money now in question.

There seems to be no controversy in relation to the $50 which was to be paid to Hazelton as Hubbard's contribution toward the erection of the railway depot, and no notice therefore need be taken of that portion of the money deposited in Draper's hands.

It is clear that the disposition made by Hubbard of the $600 did not amount to a gift *inter vivos*. To constitute a gift *inter vivos*, there must be a gift absolute and irrevocable, without any reference to its taking effect at some future period. The donor must deliver the property and part with all present and future dominion over it.   Dole v. Lincoln, 31 Maine, 422; Northrup v. Hale, 73 Id. 66; Robinson v. Ring, 72 Id. 140 ; Grover v. Grover, 24 Pick. 261.   As said in Jackson v. Twenty-third St. Ry. Co., 88 N. Y. 520, "The delivery must be such as to vest the donee with the control and dominion over the property, and to absolutely divest the donor of his dominion and control, and the delivery must be made with the intent to vest the title of the property in the donee."

It is manifest that no such delivery was made at the time the money was placed in Draper's hands.   The only gift then contemplated was one *in futuro*, and dependent upon the happening of a then uncertain event, which, however, did not happen.   Then, it can scarcely be contended that there was at that time any delivery whatever, even a conditional one. Draper was clearly Hubbard's agent or trustee, to hold the money for him, and in case of his death during his journey, to effectuate for him an intended gift to the Foundlings' Home by handing the money over to that institution, but if he returned, to hold it subject to his order.

Nor was any act performed after Hubbard's return from the East, which was tantamount to a delivery.   All that occurred then was a mere reference to this money in a conversation between Hubbard and Draper in relation to the general disposition which Hubbard wished to have made of his estate in case of his death.   So far as this particular money was concerned, no change was attempted to be made in what had previously been done.   It was referred to as a matter already disposed of. Draper was asking Hubbard whether it was his intention to give the residue of his property, after making certain specific gifts to his relatives, to charitable objects, and on Hubbard's saying that perhaps he would do so, but had not yet made up his mind, Draper referred to the money deposited in his hands for the Foundlings' Home, and asked him why, after having

selected that institution, he was undecided as to certain others. All the reply Hubbard made was, that he knew the officers of that institution or some of them, and had confidence in their management. This reply was clearly a mere statement of the motives which had actuated him in doing what he had already done, rather than an attempt to superadd any new arrangement, or make any new disposition of the money. But even if there had been a further attempt to make a gift, Draper being already Hubbard's agent and trustee, could effectuate the gift only by making an actual delivery to the donee, or by so changing the character of his own possession as to become the donee's agent or trustee. 2 Schouler on Personal Property, Sec. 85. There being no evidence that he did either, the property continued to be the donor's until his death.

Did the disposition made of the money by Hubbard amount to a gift *causa mortis?* A gift *causa mortis* is defined to be a gift of personal property, made by a party in expectation of death then imminent, and upon an essential condition that the property shall belong fully to the donee in case the donor dies as anticipated, leaving the donee surviving him, and the gift is not in the meantime revoked, but not otherwise. 2 Schouler on Personal Property, Sec. 135. Blackstone defines it to be a gift by a person in his last sickness apprehending his dissolution near. 2 Black. Comm. 514. According to Mr. Justice Story, there can be no valid donation *mortis causa*, 1, unless the gift be with a view to the donor's death; 2, unless it be conditioned to take effect only on the donor's death by his existing disorder, or in his existing illness; and 3, unless there has been an actual delivery of the subject of the donation. 1 Story's Eq. Juris., Sec. 607 a.

When the money was deposited by Hubbard in Draper's hands, Hubbard was not in his last illness, but was about to enter upon a long journey from which he apprehended he might not return. The gift was to be effectual only in the event of his death during his journey. Even if a gift made under such circumstances could be regarded as a gift *causa mortis*, the donor was fortunate enough to escape the anticipated danger, and the gift thereby became *ipso facto* void.

Nor does it seem to us that the conversation between Hubbard and Draper after Hubbard's return and after he was seized with the illness which a few days afterward terminated in his death, even tends to establish a gift *causa mortis*. The former disposition of the money was no longer operative. Hubbard had returned from his journey in safety. To establish a gift *causa mortis* a substantively new disposition of the money must be shown. Nothing of that kind, however, seems to have occurred. What was said in Hubbard's last illness amounted to a mere recognition of what had already been done, and an explanation of his motives in doing it.

But, besides this, it is quite manifest that the conversation during Hubbard's illness had relation solely to an intended disposition by him of his property by will. He was not at that time making or attempting to make a definite and final disposition of his property or any part of it, but was merely conversing with Draper in relation to the way he would wish to have his property divided in case of his death, and closed the conversation by announcing his intention to consult Mr. Dutton in relation to the matter as soon as he could have an opportunity, doubtless with the view of having Dutton draft for him a will. Such conversation, instead of supporting, negatives the theory of a gift *causa mortis*.

The verdict of the jury is unsupported by the evidence, and the judgment will therefore be reversed and the cause remanded.

Judgment reversed.