JANET SEAVEY, ADMINISTRATRIX,

v.

FLETCHER SEAVEY ET AL.

*Administration—Discovery—Sec. 81, Chap. 3, R. S.—Gifts* "Inter Vivos," *and* "Mortis Causa"—*Exceptions—Practice—Sec. 61, Chap. 110, R. S.—Trial by Jury—Sec. 5, Art. 2, Constitution—Frauds—Presumption of Regularity.*

1. This court will not consider the evidence in a case tried by the court below without a jury, where the record fails to show that an exception was taken to the final judgment.

2. Upon proceedings brought by an administratrix for the recovery of notes claimed to belong to an estate, it is proper to refuse a trial by jury in the Circuit Court upon appeal from the County Court.

3. Section 5, Art. 2, of the Constitution of 1870, was not intended to introduce jury trials in special summary jurisdictions, which were unknown to the common law, and which do not expressly provide for that mode of trial.

4. The provisions of the Constitution touching trials by jury do not apply to courts exercising discretionary equity powers or jurisdiction.

· 5. The delivery of indorsed notes to a third person, upon the understanding that the donor shall receive the interest thereon during his natural life, the same upon his death to be divided equally between persons named, if unrevoked, amounts to a gift "*inter vivos*," and also to a good gift "*mortis causa*."

6. In actions of this character the County Court is not confined to the technical legal rights of the parties in interest, but may act upon their equities as well.

7. The presumptions are in favor of the regularity of a judgment of a court of record of general jurisdiction.

[Opinion filed May 25, 1889.]

APPEAL from the Circuit Court of Ogle County; the Hon. EGBERT JAMIESON, Judge, presiding.

Messrs. MORTON D. SWIFT and JOSEPH SEARS, for appellant.

The administratrix had a right to a jury trial. Sec. 5, Article 2, Con. of 1870; Roberts v. Draper, 18 Ill. App. 167.

In a recent case in the Appellate Court of the first district, Roberts v. Draper, 18 Ill. App. 167, the law is held as follows:

"To constitute a gift *inter vivos* there must be a gift absolute and irrevocable, without any reference to its taking effect at some future period. The donor must deliver the property and part with all present and future dominion over it." Citing Dale v. Lincoln, 31 Me. 422; Northup v. Hale, 73 Me. 66; Robinson v. Ring, 72 Me. 140; Grover v. Grover, 24 Pick. 261.

If such be the law, we claim the evidence is mainfestly insufficient to establish a valid gift. It is apparent that Asa A. Seavey did not part with his dominion over the property, but that he retained it fully after the supposed making of the gift.

Again, this was a case of the delivery of property to a third person for the benefit of the donee.

In 2 Redfield on Wills, at page 307, the law in such cases is stated as follows:

"There can be no question that a delivery to a third person for the benefit of the donee will be sufficient, provided the

donor part with all control over the subject of the gift. But so long as the donor retains control over it, the holder is regarded as his agent, and the direction to keep it for the donee will not amount to any present delivery sufficient to create a *donatio mortis causa.*"

We claim that although in this case the writer speaks of a *donatio mortis causa*, the same rule applies to gifts *inter vivos*. It is sufficiently shown by the evidence that Asa A. Seavey did not part with all control over the subject of the gift, and, in fact, he expressly reserved the control in words, for the purpose of collecting the interest, and the entire control was resumed shortly after the pretended gift, and it is clear that Fletcher Seavey acted as the agent of the said Asa A. Seavey and not as the agent of the supposed donees.

Again, we claim that the said gift is void by the 6th paragraph of the Statute of Frauds, p. 1199 Starr & C. Ill. Stat., which is as follows:

"Every conveyance of goods and chattels on consideration not deemed valuable in law shall be taken to be fraudulent, unless the same be by will duly proved and recorded, or by deed in writing duly acknowledged or proved, and recorded as in the case of deeds of real estate, or unless possession shall really and *bona fide* remain with the donee."

Was there a gift *mortis causa?*

The whole evidence of this transaction was the testimony of Fletcher Seavey, who stated, in substance, that on the 25th day of July, 1887, when he was visiting his father at his home, his father arose from his bed and went to a cupboard and took therefrom a key and gave it to him, with these words: "Here is that key; now, I want you to be sure that my wishes are carried out in regard to those notes."

This conversation or transaction was over three weeks before the death of Asa A. Seavey, and it does not appear satisfactorily from the evidence that Asa A. Seavey did not then expect to recover. It does not appear affirmatively that it was the key of the drawer where the notes were kept that was then delivered, or that Fletcher Seavey accepted the trust, and is inconsistent with the testimony of John S. Miller, who

testifies that in August, 1887, he had a conversation with Asa A. Seavey about borrowing money, which he detailed, from which it is apparent that Asa A. Seavey still had the key, and what we claim as fatal to the claim to a gift *mortis causa*, is, that no words of gift were used, and no sufficient delivery of the property was made.

Messrs. DIXON & BETHEA, for appellees.

This was not a proper case for a jury. It was a citation against heirs in the County Court, on the probate side, in a special statutory court. No jury could be had at common law or under the statute. Sec. 81, Chap. 3, R. S; 1 Williams' Ex., 331, 336; Higbee v. Bacon, 11 Pick. 423; In Re Wm. Steele, 65 Ill. 322 ; Wood v. Farrell, 97 Ill. 614 ; Heacock v. Hosmer, 109 Ill. 250 ; Sedgwick's Const. Law, 489.

The delivery of the notes in question by Asa A. Seavey to Fletcher Seavey in the summer of 1886, with his indorsement, and with the statement that he should hold the notes, give to Asa what interest, if any, he wanted, and at his death divide the notes equally between his two daughters, made a good irrevocable gift, *inter vivos*, in trust, to Fletcher, for the use of the daughters and the donor. 2 Schouler Pers. Prop., 120; Doty v. Wilson, 47 N. Y. 580 ; Martin v. Funk, 75 N. Y. 134; Minor v. Rogers, 40 Conn. 512; Smith v. Ossipeval, 9 Atl. Rep., 792; Gerrish v. New Bedford Inst., 128 Mass. 159; Love v. Francis, 29 N. W. Rep. (Mich.) 847; Eastman v. Woronoco Saving Bank, 136 Mass. 208 ; Tillinghast v. Wheaton, 8 R. I. 536 ; Camp's Appeal, 36 Conn. 88 ; Hill v. Stevens, 63 Maine, 364 ; Grymes v. Hone, 49 N. Y. 17 ; Sims v. Sims, 8 Porter (Ala.) 449 ; Pope v. Burlington Saving Bank, 48 Am. Rep. 788, citing 73 Ala. 412 ; 1 Story's Eq. Jur., Sec. 607 ; Dresser v. Dresser, 46 Maine, 48 ; Padfield v. Padfield, 68 Ill. 210 ; 1 Perry on Trusts, Sec. 86, 96, 102 ; Otis v. Beckwith, 49 Ill. 121 ; Brandon v. Brown, 106 Ill. 519.

The final delivery of key by Asa A. Seavey to Fletcher Seavey, on July 25, 1887, completed the gift, beyond controversy, and made it a valid gift *inter vivos*. 1 Pars. Cont., 234; 2 Schouler Personal Prop., 72, 172; Stephenson v. King,

Seavey v. Seavey.

50 Am. Rep. 172, note ; 19 Cent. Law Jour., 423 ; Dresser v. Dresser, 46 Me. 48.

The facts in the case show a good gift *mortis causa,* if a gift *inter vivos* has not been proved. 2 Schouler P. P., 122, 128, 150, 164, 167 ; Virgin v. Gaither, Adm'r, 42 Ill. 39; Grymes v. Hone, 49 N. Y. 17 ; Dresser v. Dresser, 46 Me. 48.

Declarations of deceased that such a gift has been made are sufficient to warrant the finding that there was a delivery. Grangdiac v. Arden, 10 Johns. 293 ; Doty v. Wilson, 47 N. Y. 580 ; Roberts v. Draper, 18 Ill. App. 167 ; Boudreau v. Boudreau, 45 Ill. 480; Minchin v. Merrill, 2 Edw. Ch. 333.

A delivery of an unindorsed promissory note makes a valid gift of either kind. It is not necessary for us to prove indorsement. Wilson v. Keller, 9 Ill. App. 347 ; 1 Parsons on Con., 237; 2 Schouler's Personal Prop., 72, 75, 67, 79, 80, 137, 157, 158; Brown v. Brown, 18 Conn. 410; Session v. Moseley, 4 Cush. 87; Grover v. Grover, 24 Pick. 261.

A circumstance favorable to a gift is the relationship of parent and child. 2 Schouler's Personal Prop., 88, 89.

In the case of a gift the assent of the donee need not be proved ; it is presumed. Forbes v. Jason, 6 Ill. App. 395.

There is nothing in the statute to prevent the husband from disposing of personal property, free from the claim of the wife, by gift to his children in his lifetime. The husband has such right under the laws of our State. Padfield v. Padfield, 78 Ill. 16.

Also, to same effect, Kerr on Fraud, 220, note; Holmes v. Holmes, 3 Paige, 363.

Upton, J. This was a special statutory summary proceeding, commenced in the County Court of Ogle county by the appellant, as the administratrix of the estate of Asa A. Seavey, deceased, under Sec. 81 of Chap. 3, R. S., against the appellees, for discovery and to obtain the possession of certain promissory notes therein described, as belonging to the estate of decedent, Asa A. Seavey.

On the hearing in the County Court it was held that Ellen E. Moeller and Clara A. Hughes had in their possession or

under their control certain of the notes in the said petition
referred to, and that the same belonged to the appellant as
administratrix, and the court ordered and directed the delivery
thereof to the appellant, and discharged Fletcher and William
A. Seavey, finding nothing in their hands to said estates belong-
,ing ; from which finding and order an appeal was taken to
the Circuit Court of Ogle county.   Upon a hearing had therein
by the court, without a jury, the finding and judgment of the
County Court was reversed and set aside, and the appel-
lees were all discharged, the Circuit Court holding, by its
judgment, that the notes so in the hands and possession of
the said Clara A. Hughes and Ellen Moeller (of which pos-
session there was no contention), were the notes, property
and effects of the said Clara A. Hughes and Ellen E. Moeller,
appellees ; that they were the lawful owners thereof, by valid
gift *inter vivos* or *mortis causa*, from the decedent in
his lifetime to them, and that appellant, as such administra-
trix, had no claim thereto or interest therein ; from which
finding and judgment of the said Ciucuit Court appellant took
an appeal to this court, and it is now before us for review.

The facts appearing in the record before us are, in brief,
that Asa A. Seavey, decedent, died intestate in the county of
Ogle in August, 1887.   Appellant was his widow and is admin-
istratrix of his estate.   In the lifetime of decedent, prior
to the gift to appellees here sought to be established, he was
the owner, holder and payee of the notes in question, which
are now held by Ellen E. Moeller and Clara A. Hughes,
appellees.   In the spring of 1886, decedent, desirous of making
some necessary provision for the appellees, Ellen E. Moeller
and Clara A. Hughes, who were his daughters by a former
wife, being himself advanced in years and in poor health,
called upon his son Fletcher Seavey, one of the appellees,
stating to him that he (decedent) had certain promissory notes
in a package which were at the house of one James Donald-
son, and which he requested Fletcher Seavey to get and take
care of for him.   The notes in the package having been
obtained as requested, decedent came to his son Fletcher's
house, and being informed that the package of notes had been

Seavey v. Seavey.

obtained, stated to his son that he desired them to be divided between the girls, Ellen E. Moeller and Clara A. Hughes, after his (decedent's) death.

This interview, and those subsequent thereto, were stated on the trial below by Fletcher Seavey, who was called as a witness by the appellees, to have been in substance as follows: "I then said to father, 'The mere fact of that package of notes being in my possession may not be sufficient evidence of your intentions as stated to me.' Father replied, 'I have taken counsel on that matter; you give me a pen and ink;' which I did, and father wrote his name across the back of the notes, handed them back to me, and said, ' Those notes are mine no longer; I want you to be sure and deliver them to the girls (his daughters, appellees,) when I am dead, and the only consideration I ask is, that I have the interest on them, or what of it I may need, as long as I live.' I told him I would like him to tell brother William Seavey of the arrangement he had made, and he said he would. Father spoke to me several times after that of the fact that he wanted the girls to be sure and have those notes. He said several times to me that I must be sure and deliver the notes to the girls, and what interest should accrue upon them that he did not use. I told him I would do so. He said he should trust me to collect the interest on the notes, and give to him what of it he should need to live on. The notes in question were the notes there in that package of notes, which were indorsed and delivered to me by father. Father stated at the time that so long as he was able to go around and attend to it he would collect the interest on the notes, and he done so on two occasions, and then returned the notes to me. These notes remained with me until February, 1887. During that winter, and prior to February, Mr. Sweet's note became due, and father (who lived about twelve miles from my place) wrote me to bring the Sweet note up to his place. I did so. He said Sweet paid the interest. He gave me back the note; I took it home with me. In February, 1887, father wrote me stating that as I lived so far away from the parties which these notes were against, and the roads were then getting bad, and as brother

William lived much more convenient, I had better let him take the notes to collect the interest, and save me the trouble of driving so far, as father was not able to be around much that winter, as he wrote me. I sent the notes to him for that purpose.

"Father spoke with me again about those notes, which was in his last sickness, and shortly before his death. I was informed of his sickness and went up to see him at his request. He said to me that he had put those notes in the package in the bank at Polo. He said William had a key, and he had got a key for me of the box in the bank where the package of notes were put.

"The next time I saw father he was quite sick, but he got off the bed and took from a wardrobe in the room a key and gave it to me and said, 'Here is that key; now, I want you to be sure and see that my wishes are carried out in regard to those notes, as I have stated to you.' He said if anything happened to him he wanted those notes disposed of according to the agreement with me.

"This was his last illness, and on the 26th of July, 1887, he died, a short time after that. I was with him much of the time until his death. He did not leave his house or room after giving me the key. I kept the key he gave me until after his death. Then I and my brother William went to the bank at Polo and delivered up the key to the bank attendant, and the notes in controversy were delivered to me, and brother went with me and I delivered the notes to my sisters, according to my agreement with my father to do."

William Seavey, a witness called by appellant, testified, in substance, that he had a conversation with the decedent, his father, about the notes here in question, in July or August, 1886. "Father stated to me that he had been down to brother Fletcher's and signed the notes over to him; that the interest on the notes, if father needed it, was to be given to him, and at father's death the notes were to be delivered to and divided between my sisters Mrs. Ellen Moeller and Mrs. Clara Hughes. I can not state the exact words, but this was in substance what he said. I asked father if my brother, Fletcher

Seavey v. Seavey.

Seavey, would be obliged to turn those notes over to the girls, my sisters. He said he relied upon Fletcher's honor, and he thought he would do as he had asked him to do with them. The next time we talked on this subject was on the 9th of July, 1887, at father's house. I asked him to state over to me again just how he wanted those notes divided, or what he wanted done with them. He then told me again, just as he had before, that at his death the notes should be delivered to my sisters and be divided equally between them. Some time in the winter of 1887 I met father in Polo. He told me that my brother, Fletcher Seavey, had sent those notes up to me, and he wished me to take charge of them and see that the interest was collected. I told father that I did not want to take them over home; I had no place to keep them, and I should not like to take them home. I told him I thought it better to have them at the bank in Polo, as I could get them there, and the parties would be likely to pay the interest at Polo, and asked him to go into the bank and see what arrangements he could make so that I could get them. He went in the bank, soon came out and said we could leave them there. The package of notes was handed the bank attendant, who placed it in a box, locked it, brought out two keys, said they were the only ones that would open the box, handed one to father and the other to me. After that I went to the bank, got the Grimes note, collected the interest, which was then indorsed upon it. I paid the money to father and returned the note to the box in the bank.

"I knew the Oldwine note; it was taken up and a new one given, and a new mortgage to secure it, at Allaben's office in Polo. The new note was for $1,000.

"The notes in the package that I saw were all indorsed by father, and the new note of Oldwine was indorsed by father when it was put back with the other notes in the bank. I got the Oldwine note and mortgage out of the bank at the time the new one was given, but can not tell the date. In August, 1887, father told me at his house that he had given the key to the box in the bank to my brother Fletcher. The notes were all indorsed in father's handwriting when we took them from

the bank after his death, except the one of Moeller's, and I went with Fletcher Seavey to Dixon when he delivered those notes after father's death, to the girls, my sisters, Ellen Moeller and Clara Hughes, as he had requested."

Mrs. Donaldson, called by appellees, testifies in substance: "I am a sister of decedent. In February, 1886, brother Asa Seavey brought some papers in a package to my house, handed them to me, and told me to keep them until called for. Shortly after this, brother Asa called at my house and wanted the package to get out some notes to collect the interest upon them, he said, and I got the package. The papers in it were notes; I saw them. The notes were against some of the same persons as those in question and the same notes. I gave this package of notes to Fletcher Seavey at the request of my brother, Asa Seavey.

"Asa Seavey stated to me, in 1886, that he had been down to Dixon, had seen Fletcher Seavey, his son, and that his son was coming up after these papers. I knew the package contained the notes in question; I saw them. He stated to me that he had turned the notes over to Fletcher Seavey; that he could have the interest on them, what of it he wanted, while he lived, and at his death Fletcher was to give the notes to the girls, Mrs. Moeller and Mrs. Hughes. He said he took Fletcher in preference to William, because *what he told Fletcher to do he would do just as sure as he could do it himself*. This was after he had turned the notes over to Fletcher. He said at our house, in the summer of 1887, that Fletcher had put the notes in the bank at Polo; that they had got a box in the bank; that William had one key and that he had the other, and when he got able to ride about Fletcher would let him collect the interest, and when he was not able William would do it. He said that the key he had was to be sent Fletcher. He was at our house about four weeks before his death; he was then quite weak; had consumption. He was talking about sending the key of the box in the bank down to Fletcher. He said *Fletcher must have it*. He stated that he had signed the notes all over to Fletcher for the girls, and

he was going to send down and have Fletcher come up and get the key. He was taken sick in a few days after this, and died in a short time."

J. W. Allaben, called by appellee, stated, in substance: "I am an attorney at law, but not attorney for decedent. Did some business with him and one Oldwine in the spring of 1887. Oldwine had given Asa Seavey a note secured by mortgage, which had become due, and I was asked if the mortgage could be continued without making a new one. I said yes, but the mortgage would be due still. Oldwine wanted an extension; Asa Seavey said he could not make a new mortgage because he could not get the old mortgage then, and then the matter ended for the time. Some days after this, Oldwine and Asa Seavey came into my office with William Seavey. I made a release of the old mortgage, drew a new note for $1,000 and a mortgage to secure the same. After I had drafted the new note and mortgage, Asa Seavey asked in whose name I had drawn the new paper. I replied, in his name. He said it belonged to another party, and asked me how about that. I told him he could assign the note or the mortgage and that would be all right. He said the note belonged to some of his children, or one of his sons, or something of that kind."

Dr. Snyder, a witness called by appellee, stated, in substance: "I am a physician; called on and attended Asa A. Seavey during his last sickness. Was first called July 26, 1887. He was then seriously ill; difficulty with lungs and stomach. He never recovered; it was his last sickness. When first called he asked if I thought I could get him up again. I told him possibly I could for a little time, but that he could not get well. I gave him to understand that he could not get well, that there was no hope for him."

John S. Miller, called for appellant, stated, in substance: "I gave decedent a note for $700, which is not paid. In November, 1886, I paid the interest on that note to Asa A. Seavey. He had the note then at my house. I indorsed the interest paid upon the note; did not see any indorsement of Asa A. Seavey's name on the back of it. About the second week in August, 1887, I applied to Asa A. Seavey for the

loan of $100. He had not the money with him; said it was in a box at the bank in Polo, and he could not get it out; thought in a day or two he could. He was sick then. He said William Seavey could get it. I did not get the money. I am seventy years old."

D. M. Smith, a witness called by appellant, stated, in substance: "In April, 1886, I gave a note to decedent for about $132, for money loaned. March 5, 1887, called at decedent's house to pay interest on the note. Asa A. Seavey said he could not take it, for the note was down at the bank in Polo. I paid him as interest to apply on the note $10, took his receipt therefor, and he was to meet me some day and indorse it on the note. Afterward met him in Polo; asked him to make the indorsement. We went into the bank, he gave a key to the cashier and told him to hand to him his pocketbook. It was handed to him. We went into another room. I indorsed the payment on the note. I did not see Asa Seavey's name on the note, and I don't think it was there."

Asa Grimes, a witness called by appellant, testified, in substance: "I knew decedent in the fore part of the year 1886. Seavey had my note. I paid the interest on it to William Seavey, a son of Asa A. Seavey; I paid $10. In 1886 Asa A. Seavey called upon me for the interest; he was going somewhere, and I gave him the interest on one note and $20 on the principal. In the spring of 1886 we made a new note, and the two notes are against me yet, unpaid. I don't think my notes were indorsed by Asa A. Seavey, but can't tell. I made interest payments to Asa, except once to William."

Frank Oldwine, called by appellant, in substance stated: "I knew decedent in his lifetime; had done business with him. Gave him my note for $1,500, secured by mortgage in 1887, in January. I had paid the interest and $400 before this, and I wanted to extend the payment; the old note was due then. He said I could have the money longer if I wanted it, he guessed. There was then due about $1,100, and some interest. Seavey said he did not have the note; that it was down with his son. If I would come the next week or so he would send down and get it. On the 12th of February,

1887, I went again, and paid Seavy $100, and what interest was due, and he said I could keep it as long as I wanted to. I was not satisfied with that, and a new note and mortgage was made by lawyer Allaben, at Polo, for $1,000, and I took up the old note and I have it home now. It was indorsed by Asa A. Seavey."

This, in substance, was all the evidence shown by the record bearing on the contention now before us.

The record does not show any exception to the final judgment rendered in this case. Sec. 61 of the practice act, Chap. 110, R. S., requires a bill of exceptions in trials by the court in questions of fact. In Fireman's Ins. Co. v. Peck, 18 N. E. Rep. p. 752, the Supreme Court of this State held, that "in cases tried by the court, without a jury, the bill of exceptions must show that an exception was taken to the final judgment of the court, and if that is not done, the appellate court will not look into the evidence, but will presume that it sustains the finding of the court below."

Manifestly, then, the findings of the court below upon the facts ought not to be disturbed by this court, and the judgment of the Circuit Court should be affirmed, unless appellant's contention on questions of law presented in this record, unaffected by questions of fact, call for the interposition of this court.

First. Appellant contends that the trial court erred in refusing appellant's motion for the trial in the Circuit Court of this proceeding *by a jury*. It must be conceded that appellant obtained no right to a trial by a jury simply by the appeal to this Circuit Court. It was a trial *de novo*, and unless the proceeding in the County Court presented a proper case for a trial by jury in that court, such right could not be acquired by an appeal to the Circuit Court. This proceeding was for the discovery of and to obtain information concerning the possession of certain promissory notes in the petition particularly mentioned, and was not designed to aid in the collection of debts due to the estate. Williams v. Conley, 20 Ill. 643.

This is a proceeding in the County Court, sitting in probate, unknown to the common law. At common law, jurisdiction

in cases of this character was vested in the ecclesiastical or chancery court, and such courts had no juries. Williams on Ex., Vol. 1, p. 336, and notes.

Sec. 5 of Art. 2 of the Constitution of 1870, which provides that "the right of trial by jury, as heretofore enjoyed, shall remain inviolate," was not intended to introduce jury trials in special summary jurisdictions which were unknown to the common law, and which do not provide expressly for that mode of trial. Ward v. Farwell, 97 Ill. 614–15, and cases there cited.

It was held by the Supreme Court in The People v. Abbott, 105 Ill. 392, which was a proceeding under the provisions of the same statute, and of the same nature as the case at bar, "That proceedings under this statute were summary proceedings, and in this class of cases, even if it is established that the property claimed is in the possession of another, and that it is the property of the estate, the court is not bound to order its delivery to the administrator. The court is vested with a discretion, and is not bound by any arbitrary rule of law to make any special order, but its discretion should be so exercised as best to preserve the estate and promote its honest, complete and prompt administration; and in this class of cases arising under the statute now in question, the County Court is not limited to the technical *legal* right of the parties, but should act upon their *equities*. The People v. Abbott, *supra*, and cases there cited, and 10 Ill. App. 62. In Peacock v. Mosmer, 109 Ill. 250, it was held that neither the provisions of the Constitution of 1848, or of 1870, in regard to trials by jury, was ever understood as applying to cases over which courts of equity have jurisdiction," and it might have been added with propriety, it is believed, or to courts exercising discretionary equity powers or jurisdiction. It was held in In Re William Steele, 65 Ill. 324, that "A citation to an administrator to account is not a suit at law, but the exercise of a summary power confered by statute and likened to a bill of discovery in chancery to sift the conscience." The same doctrine is held in Gilbert v. Guptill, 34 Ill. 112.

In Howard v. Slagle, 52 Ill. 337–340, which was an appeal from an order of the County Court approving settlements of

estate, etc., the court say: "We take occasion to say the Probate Court should, on the trial of this case, proceed as though a bill in chancery had been filed, and hear the evidence * * without the introduction of a jury, * * as in ordinary chancery cases," etc.

Not that the County Court was invested with chancery jurisdiction, but that in the exercise of discretionary power conferred upon that court in a summary statutory remedy, *no jury is required.* It is believed that the right of trial by jury in this class of proceedings was not "enjoyed" or seriously claimed by the people of this State prior to the adoption of the Constitution of 1870, and therefore is not within the scope or purview thereof. It is certain that in this class of cases the right is not conferred by any statutory enactment of the State, and hence we conclude that the Circuit Court was not in error in so holding.

It is true in the case of Robertson v. Draper, 18 Ill. App. 167, a jury was used in the Circuit Court upon the trial of that case, but the question was not raised or presented, or in any way passed upon in either the trial or appellate courts.

It is further contended by appellant that it was error in the presiding judge at the August term, 1888, to refuse to vacate the judgment entered by the trial judge in vacation on appellant's motion. The record discloses a full hearing before the trial court, a submission of the case to that court, on briefs of counsel to be thereafter filed, which were filed with the court, and after due consideration the opinion of the court was filed in writing in the case, which fully authorized the judgment entered thereon, and forasmuch as it does not affirmatively appear that the judgment and entry thereof was unauthorized by the terms of the submission and the agreement of parties, and inasmuch as this point is not presented by the bill of exceptions, we are precluded from its examination, and must presume in favor of the legality of the judgment of the Circuit Court. Deitrich v. Waldron, 90 Ill. R. 116; Steinman v. Steinman, 105 Ill. R. 348; Fireman's Ins. Co. v. Peck, 18 N. E. Rep. (not yet reported) 752, *supra.*

It is claimed that the delivery of the notes in question, as before stated, and the indorsement thereof, and declaration

to Fletcher Seavey at the time of such indorsement and delivery, constituted a trust for the benefit of his daughters, Mrs. Moeller and Mrs. Hughes, of the notes, and valid as a gift "*inter vivos*," as found by the trial court, or if not, still valid as a gift "*mortis causa;*" indeed, this is the turning point in the case, in law and fact. Conceding for the moment that we are at liberty to examine the facts as well as the law upon this contention, as fully as if presented by a bill of exceptions in the record before us, and further conceding that the evidence hereinbefore recited was all the evidence introduced on the hearing in the trial court, as appellant claims, let us briefly examine the question—did the trial court err in its finding on the hearing of this case, either as to the law or the facts, to the manifest prejudice of the appellant, as is claimed in the argument before us?

In Otis v. Beckwith, 49 Ill. 121, where a policy of insurance on the life of the assignor was voluntarily assigned by him to a trustee for the benefit of his three children, notice of which assignment and trust was given to the insurance company, and also to such trustee, who accepted the trust, but the policy and the assignment both remained in the possession of the assignor, and was found after his decease among his other papers, it was held, in a suit by the trustee against the administrator of the assignor to compel a surrender of the policy to him as such trustee, and that he be declared the owner thereof:

First. That an actual delivery of the policy and assignment thereof to the trustee was not necessary to complete the trust created.

Second. That the acts of the parties—the one notifying the other of the assignment and trust, and his acceptance thereof—constituted a sufficient delivery to complete the title in the trustee.

Third. That the object sought to be accomplished by the assignor in making the assignment, to make provision for his children, being established, equity will carry out such intention, though the transfer be voluntary and without consideration, the assignor never having manifested any desire to retract the act.

In such cases equity will look to the substance of the act done, and the *intention with which it was done*, and in the absence of fraud, *carry out such intention* and *give it full effect*. To the same effect are Radfield v. Radfield, 68 Ill. 210; Woodburn v. Woodburn, 11 West. R. 789. In Schouler on Personal Property, Vol. 2, p. 120, it is said: "Certain reservations annexed to a gift by a donor have been deemed quite consistent with the purpose of gratuitous transfer. There may be a gift, notwithstanding the donor reserves the right to obtain or receive some kind of personal profit or benefit out of the transfer, as in the instance of a gift of money, with the reservation by way of interest. Some of the latest cases carry the donor's right of reservation very much farther, even to the extent of not requiring the donor to totally exclude the power or means of retaining possession of the gift."

In Doley v. Wilson, 47 N. Y. 580, a father gave his son a certain amount of money, reserving the interest thereof for life, and it was held a gift "*inter vivos*" and not a loan or advancement, the question turning on the intention of the father, the donor. In Stone v. Hackett, 12 Gray, 227, Kitteridge gave certain stocks to Stone to hold in trust, to pay the income during his life to Kitteridge, the donor, and at his death to divide the same between certain societies, naming them; Kitteridge, the donor, reserved the right to modify the use or to revoke the trust. The income was paid to the donor during his life. This was held a valid gift, "*inter vivos*." The court said: "We know of no principle of law which renders a transfer of property "*inter vivos*" invalid, because the donor never parted with his power or dominion over the property, or retained the right to make or annul the trust, etc. The entire *jus disponendi* was in the donor."

In Grover v. Grover, 24 Pick. 261, the donor handed over to Blanchard a note, secured by mortgage, which was unrecorded, at the same time saying, "I will make a present of these to you if you will accept them." Before acting the donee handed the note and mortgage back to the donor, say-

ing, "you may keep the papers until I call for them, or collect them for me."

There was no assignment of the note or mortgage; afterward the donor put the mortgage on record, and after the donor's death the note was found among his papers unindorsed by him. The court held that "the note passed without indorsement, and that it was a valid gift *inter vivos*, and was not revoked by their re-delivery to the donor." Under many modern authorities an actual delivery of the thing donated is not absolutely essential to make a gift. A trust, has been held, may be declared by the donor for use of another by parol. In Martin v. Funk, 75 N. Y. 134, Mrs. Bloom deposited in bank $500, declaring that she wanted it held in trust for Lillie Willard. The account at the bank was so entered, and the pass book delivered to Mrs. Bloom, who remained in possession of it until her death. Miss Willard, the beneficiary, was entirely ignorant of the deposit. Mrs. Bloom drew out of the bank one year's interest on the deposit. The remainder, with accruing interest, remained in the bank. It was held that this was a valid gift, "*inter vivos*." After a careful examination of the authorities the court say : " The circumstance that the donor did not intend that the object of her bounty should know of the gift until after her death, is not inconsistent with the gift ; or if the donor may have believed that such deposit might be withdrawn during her life, and the money thus deposited converted to her own use (while it is not established that she entertained any such belief *but if she did*), it would not change the legal effect of her act."

To the same effect are Miner v. Rogers, 40 Conn. 512, and Smith v. Ossipee Savings Bank, 9 Atlantic Rep. (N. H.) 792, which last case was a deposit of money in bank in the name of another, subject to the right of the depositor to take the income during the life of the donor. It was held to be a valid gift "*inter vivos*." In Ganish v. New Bedford Inst. 128 Mass. 150, " A" deposited money for his grandchildren, kept the pass book himself, received and used the dividend from the deposit during his life. It was held a valid gift, "*inter*

*vivos.*" To the same effect, on the question of actual delivery
and trusteeship, are the following:  Love v. Francis, 20 N. W.
Rep. 847 ; Eastman v. Moronoco Sav'gs Bk., 136 Mass. 208 ;
Tillinghast v. Wheaton, 8 R. I. 536 ; Camp's Appeal, 36
Conn. 88 ; Hill v. Stevens, 63 Maine 364 ; Grymes v. Hone,
49 N. Y. 17 ; Sims v. Sims, 8 Porter (Ala.) 449.

In the case at bar, decedent, Asa A. Seavey, made declara-
tion of trust as to the notes in question, accompanied with
delivery thereof to Fletcher Seavey as trustee, who in effect
retained possession thereof until the donor's death, for the
benefit of his daughters, Mrs. Hughes and Mrs. Moeller.  The
decedent reserved the right to have the interest accruing
upon such notes, or so much as he should need for support
during his natural life, and at his death the notes were to be
delivered to the beneficiaries and divided between them.  The
intent of the donor was manifest, the trust or gift was not
revoked, but re-asserted again and again until within a few
days of his death.

The deposit of the note in the bank at Polo was made with
the knowledge and consent of the donor and trustee, and the
trust accepted, and from the time of creating such trust until
his death, Asa A. Seavey declared that the notes in question
belonged to his daughters, the appellees.

We think, therefore, that the trial court did not err in hold-
ing such disposition as is here shown of the notes in question
a valid gift "*inter vivos.*"  But, even if that were not so upon
the facts here presented, and the law, as we understand it to be,
we should be inclined to hold that it would constitute a good
gift, "*mortis causa*" of the notes in question, and so the appel-
lant could not have been prejudiced by the ruling and judg-
ment of the trial court.

In support of this view may be cited 2 Schouler on Per-
sonal Prop. 128, 148, 150.  And if made to a third person in
trust, it is not revoked by death of the donor before delivery.
Schouler Personal Prop. 80, 165, 164 and 167; Dresser v.
Dresser, 46 Maine, 17; Grymes v. Hone, 49 N. Y. 17; Vir-
gin v. Gaither, 42 Ill. 39; Woodburn v. Woodburn, 11 West
Rep. 189.

Appellees' right to the notes in question could have been enforced in a court of equity against the trustee, and the County Court sitting in probate in this proceeding was not limited to the technical legal right of the parties, but was authorized to act upon their equities. The People etc., v. Abbott, 105 Ill. 593; Brandon v. Brown, 106 Ill. 519; Millard v. Haines, 119 Ill. 198, and cases cited therein.

Our attention has been called by appellant to the case of Roberts v. Draper, 18 Ill. App. 167, as announcing a different rule. We have examined that case with care, and find nothing there in conflict with the views hereinbefore expressed.

The general rule of the common law is, in the case last cited, stated with the concise brevity and accuracy of the distinguished jurist who wrote the opinion in that case, but the most cursory examination of the facts of that case will establish that it can have no application to the one at bar.

We think Sec. 6, Chap. 59, R. S., title "Frauds," does not apply to the case at bar, because

1.   The possession of the notes in question, really and *bona fide*, did remain in the agent or trustee of the donor.

2.   The gift in question is not attacked by creditors of the donor, or required for payment of debts against his estate, and is founded upon a good consideration (love and affection), and hence can not be assailed by the donor, his heirs, administrators or executors. Campbell v. Whitson, 68 Ill. 240, and cases cited. We have also examined all the authorities cited by appellant, in his brief before us, with what of time and care we had at our command, and in our judgment the same are not sufficient to establish appellant's contention in the case, and finding no substantial error in the proceedings and judgment of the Circuit Court, for the reason before stated that judgment must be affirmed.

*Judgment affirmed.*